# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs September 7, 2011

## STATE OF TENNESSEE v. ERIC RICARDO MIDDLETON

**Direct Appeal from the Circuit Court for Madison County**
**No. 08-442    Donald H. Allen, Judge**

**No. W2010-01427-CCA-R3-CD  - Filed November 14, 2011**

The defendant, Eric Ricardo Middleton, was convicted by a Madison County Circuit Court jury of first degree premeditated murder; second degree murder, a Class A felony; and tampering with the evidence, a Class C felony.  He was sentenced to an effective term of life imprisonment plus twenty-five years.  On appeal, the defendant argues that:  (1) the trial court erred in allowing the doctor who performed the autopsies on the victims to testify as an expert; (2) the trial court erred in denying his request for a jury instruction that Mary Thompson, the co-defendant, was an accomplice as a matter of law; (3) the evidence was insufficient to sustain his convictions; and (4) the trial court erred in imposing partial consecutive sentences.  After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JEFFREY S. BIVINS, JJ., joined.

George Morton Googe, District Public Defender; and Gregory D. Gookin, Assistant Public Defender, Tennessee, for the appellant, Eric Ricardo Middleton.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; James G. (Jerry) Woodall, District Attorney General; and Shaun A. Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

As a result of their involvement in the homicides of Bobby Perry and Andreca Manning and subsequent attempt to conceal the homicides, the defendant and co-defendant,

Mary Cormill Thompson, were indicted on two charges of first degree premeditated murder and tampering with the evidence. The defendant was additionally charged with aggravated arson.[1] The defendant's and co-defendant's trials were severed.

## State's Proof

At the defendant's trial, Thomas Jackson testified that he owned a single-family residence at 10 Webb Street in Jackson, Tennessee. In March 2008, Jackson rented the house to Mary Thompson, and Thompson's sister also lived there with her. A fire at the house on March 17, 2008, caused extensive damage, "total[ing] the house." He had last been at the house about a week prior to the fire at which time Mary Thompson was there with "a young man. A friend[] of hers." On cross-examination, Jackson stated that he talked to Thompson around the time of the fire, and she informed him that she was getting ready to move back to Mississippi because she could no longer afford the rent on the house.

Mary[2] Thompson testified that, in March 2008, she was living in a rental house at 10 Webb Street with the defendant; her sister, Thelmisha Thompson; and her two-year-old niece, Ricarla. The defendant was her boyfriend at the time, and they had dated since July 1999. Mary admitted that she had been charged with first degree murder, along with the defendant, but denied that she had been promised a deal in exchange for her testimony.

Mary testified that, on March 14, 2008, the defendant had been living with her for about three weeks, having recently moved from Mississippi where they both were from. The night of the 14th, she was home with the defendant and her niece. She and the defendant had both been drinking Paul Masson brandy, and the defendant had drunk "a couple" of beers as well. Around 10:00 p.m., Bobby Perry stopped by the house. Mary had known Perry for about five months and had rented cars from him in the past. Perry had told her that he was going to stop by that evening to take her and her niece to get something to eat and ride around until her sister got off work at 11:30 p.m. Perry came into the house and helped Mary get her niece's car seat and took it out to his car – a tan, late-model Cadillac.

Mary testified that, as they were walking to Perry's car, a "young lady," later determined to be Manning, who was with Perry, asked to use the bathroom. Mary took Manning inside and showed her to the bathroom. The defendant was in the house

---

[1] The defendant was ultimately acquitted on this charge.

[2] Mary Thompson and her sister, Thelmisha Thompson, are both lengthy witnesses. Therefore, for clarity, we will refer to these women by their first names at times. We mean no disrespect to either of these witnesses.

somewhere. Mary waited by the bathroom door until she heard the toilet flush, and then she went back out to the car to join Perry, thinking that Manning "was on her way out." However, Mary never saw Manning exit the bathroom. Mary sat in Perry's car talking to him for a few minutes before she started to wonder what was taking Manning so long. She told Perry she was going to check on Manning, and Perry said, "'No. I've got it.' Like that was his close friend and he would check on her."

"Almost immediately" after Perry walked into the house, Mary heard a loud thumping sound and saw the blinds moving in the living room in the front of the house. Mary left her niece in the car and ran inside to see what was happening. Mary saw the defendant "tussling" with Perry. She explained that Perry was lying on his back on the floor, and the defendant had his knee in Perry's neck. Mary saw blood "all over the area where [Perry] was lying" and on Perry's body.

Mary testified that she asked the defendant what was going on and what he was doing, and the defendant said "[t]hat it was done there. 'We got to get this mess up.'" Perry told Mary, "'Help me baby,'" and the defendant said, "No. No[]" and asked Mary to pass him the kitchen knife that was on the floor out of his reach. Mary kicked the knife close to Perry's foot and prepared to run out of the house. However, the defendant stopped her and told her to bring her niece inside. Mary said that she did not see what happened after she kicked the knife, but she assumed that Perry had gotten it because the defendant told her later that "Perry had got the knife and cut his index finger to the bone."

Mary testified that she brought her niece into the house in the back bedroom. Perry was lying on the kitchen floor and "still kind of gasping a little bit." The defendant told her that he needed her to help him. She told him that she could not, but the defendant kept "insisting [and] threatening . . . like, you know, the police fixing to come get me because it's in my house." The defendant took Mary into the kitchen where Perry lay unmoving and gasping "[v]ery faintly." The defendant tried to get her to help him pull Perry out the door, but she refused because she did not want to touch the body.

Mary testified that the defendant then told her to wait with her niece in the bedroom. Before going to the bedroom, however, Mary stopped to wash her hands in the bathroom where she saw Manning lying on the bathroom floor, bloody, and with what "looked like holes in her." Mary ran out of the bathroom and asked the defendant "'What did [you] do? Why you do that?'" The defendant would not answer, but she thought "he said that he did it for us." She "had no idea" what the defendant meant by that statement.

Mary testified that the defendant had met Perry prior to the incident when they had gone out to eat, but, to her knowledge, he had not met Manning. She had never discussed

killing Perry or Manning with the defendant. Mary said that the reason Perry came by to pick her up with Manning was because Perry wanted Mary to watch him and Manning have sex "to see how it was done." She said that she and Perry were not dating but had oral sex once. Mary did not tell the defendant about her sexual encounter with Perry.

Mary testified that she waited in her bedroom with her niece until the defendant came and got her. The victims' bodies were no longer in the house. The defendant told her that they "had to clean up that stuff," and they "cleaned for a while" in the bathroom and kitchen using bleach and Mean Green to try to remove the blood.

Mary testified that her sister, Thelmisha, was due home from work around 11:30 p.m., and the defendant left the house for ten to fifteen minutes. She said that the defendant evidently ran into Thelmisha while he was away because he returned and told Mary not to let Thelmisha in the house. When Thelmisha arrived, Mary told her that she could not come in the house and that she needed to take her niece, Ricarla, with her. Thelmisha told Mary "to get her some clothes," and, while Mary was doing so, the defendant told her to send Thelmisha to get more bleach. When Thelmisha returned with the bleach, Mary gave her a change of clothes for herself and Ricarla, and they left. Mary saw that Thelmisha was with her boyfriend.

Mary testified that, after Thelmisha left, she and the defendant hurriedly continued to try to clean the house. When they were finished, the defendant "said that we had to go." The defendant had apparently moved Perry's Cadillac and parked it nearby, and the two of them walked to the car. They got into the car and drove to an alley where "a white truck," a Ford Excursion that also belonged to Perry, was located. Mary noticed that the backseat of the Cadillac appeared to have "[a] whole bunch of things piled up on [it]" that had not been there earlier. Mary believed that the defendant had placed "Perry on the back seat piled up under a lot of stuff." The defendant told her that Manning was in the trunk.

The defendant told Mary to drive the Excursion, while he followed behind her in the Cadillac. She did not know where they were going at first, but the defendant stopped outside of Jackson and told her they were to drive to Mississippi and for her to "'[j]ust lead the way and don't speed.'" They drove through Memphis to Mississippi and then the defendant pulled beside her and told her they needed to get a shovel. They went to a Walmart in Greenwood, where Mary went in alone and bought a shovel. Mary identified surveillance photographs from Walmart of her buying the shovel.

Mary testified that, when she left the store, the defendant told her to follow him "to this place called Collins," a trucking and detail company owned by Robert Collins, Sr., whom both Mary and the defendant knew. She parked the white Excursion and got into the

Cadillac with the defendant. The business was closed, and the defendant told her that was where he wanted to park the truck for the night.

Mary testified that the defendant drove them to an abandoned building outside the city limits and dropped Mary off, telling her "to stay there until he g[ot] back and don't go nowhere and don't move." After about an hour, the defendant returned to the building, picked her up, and drove them to a hotel in the Cadillac. She noted that the "stuff" was no longer in the backseat of the car.

Mary testified that the defendant got them a room at the hotel and tried "to explain things." The defendant told her, "'I know I F'd up, but you ain't got nothing to worry about. Everything is good.'" He did not provide any explanation for why he killed Perry and Manning. They stayed at the hotel for a few hours, until around 9:00 a.m., when they drove back to Collins' business. The defendant offered to sell Collins the Cadillac and the Excursion, but Collins did not buy either vehicle. Mary noted that there was visible blood on the backseat of the Cadillac.

Mary testified that Collins gave them a check for some gas money, and they left Collins' business with Mary driving the Excursion and the defendant driving the Cadillac. Mary drove the Excursion to a gas station and parked at a fuel pump, while the defendant parked the Cadillac beside the building. Mary went in to pay for the gas, and the clerk must have "automatically turned the pump on and it started pumping too much gas, but [she] didn't know until [she] got back out to the vehicle." Mary told the clerk that she did not have enough money and was "trying to create a scene" in hopes the clerk would call the police to get her away from the defendant.

Mary testified that the clerk told her that she needed to keep Mary's license until Mary returned with money to pay for the fuel, but the defendant came into the store "kind of like shoving [her] in the back like, 'What the -- you doing? Let's go. What is going on?' And the lady said, 'She went over in her gas,' and he asked her, 'How much?' He had the money to pay for the gas." Mary said that the defendant gave her the money to pay for the gas, but she still refused to pay because she "really wanted them just to call the police." Mary finally gave the clerk a signature and promised to come back and pay. She and the defendant then left the gas station.

Mary testified that she had not called the police on her own because she did not have a cell phone, and the cell phone her sister had given them was in the defendant's possession. Mary never had the cell phone unless the defendant was also present. Mary admitted that she did not tell anyone in Walmart about what had happened but said she did not do so because she "was scared." She said that she did not tell Collins about what had happened

because the defendant was standing beside her, although she did try to gesture behind the defendant's back "like don't bother those vehicles." She did not see anyone at the hotel whom she could tell because the defendant was the one who "checked in and got the room."

Mary testified that she drove the Excursion away from the gas station, and the defendant drove the Cadillac. They drove "[d]own this back road down that could lead to the next town over." The defendant had Mary pull over and told her he was going to drive the Cadillac into the lake; however, the car got stuck on a hill and the defendant was not able to get it out. The defendant got into the Excursion with Mary and had her drive to a gas station so they could get some gasoline in a jug. After getting the gas, they returned to the Cadillac, which the defendant then set on fire. They tried to leave in the Excursion, but it had become stuck in the mud. However, the defendant was able to dig the Excursion out with the shovel.

Mary testified that they drove to a trailer park not far from the "fire site." The defendant told her that they "were going to chill" there for awhile, and "he was going to try to get that truck sold before [they] left Mississippi." The defendant's aunt's husband let them into a trailer, and the defendant's aunt arrived a few minutes later. They stayed there "for hours." The defendant talked to his aunt's husband and then left with him, while Mary remained at the trailer with the defendant's aunt. Mary told the defendant's aunt that "her nephew had did something bad," but she could not tell her what the defendant had done.

Mary testified that the defendant returned about thirty minutes later, and they remained at the defendant's aunt's trailer until dark when they left in the Excursion. As they passed through Grenada, Mississippi, on the way back to Jackson, Tennessee, they "ran into this guy from Memphis that [Mary's] sister knew," named C.J. Mary told the defendant that she wanted to ride with C.J., which she did with the defendant following them. During the trip, Mary told C.J. that "there's a lot going on and [she was] really trying to get away so he kind of like sped off and tried to leave [the defendant] behind." She did not tell C.J. exactly what had happened, and the defendant was able to stay close behind them.

Mary testified that, when they arrived in Memphis, she called Thelmisha on C.J.'s phone to have her meet them, and C.J. took her to a store near his house. Meanwhile, the defendant also talked to Thelmisha and met them at the store where he cleaned the "doors and stuff" of the Excursion. Mary and the defendant got into the car with Thelmisha; Thelmisha's boyfriend, Christopher; and Mary's niece, Ricarla. They returned to Jackson, leaving the Excursion at the store.

Mary testified that Christopher and Thelmisha dropped her and the defendant off at the Webb Street house around 10:00 or 11:00 p.m. on Saturday night, and they spent the

night there. She said that the defendant "still didn't quite want Thelmisha in the house so she spent the night with her boyfriend." The next day, Sunday, a neighbor came to her house, and Mary overheard the defendant talking to the neighbor about Bobby Perry. As far as she knew, the defendant did not tell the neighbor anything about what had happened with Bobby Perry.

Mary testified that, on Monday, she called a friend and asked for a ride to the store to pick up some packing boxes. She had been having trouble paying her rent and had thought about moving "before anything even happening." The defendant told her that he was going to the store with them, but Mary had asked her friend to "bring people so it wouldn't be room for him to get in," so the defendant stayed at the house. While they were driving, the defendant kept calling her friend's cell phone trying to get Mary to come back to the house. He then called another time and told them that Mary's house was on fire. Mary did not believe the defendant.

Mary testified that while she was at her friend's house, she received another phone call which led her to call the fire department to inquire whether there had been a fire. Mary was informed that there had been a fire at 10 Webb Street and that the house was "heavily damaged." Thelmisha had also been called at work about the fire. Thelmisha picked up Mary, and they spent the night at Thelmisha's boyfriend's house. The defendant called her that night, but she did not tell him where she was staying.

Mary testified that the defendant's explanation for killing Perry was that "he had to do it." She thought that Manning was killed "just because she was there." The defendant told her that he set the house on fire because "[h]e couldn't leave no evidence." The defendant never told her what he did with the victims' bodies; she "just kn[e]w when he came back they weren't in the Cadillac." Mary recalled that the defendant told her that his "alibi" was "[t]hat he was going to say that [Perry] tried to rape him in his butt and he killed him."

Mary testified that she had known Perry for four or five months and that the only significant problem they had occurred sometime in February when she allowed the defendant to drive a car she had rented from Perry, and Perry "told [her] he didn't want [the defendant] driving his car." However, she allowed the defendant to again drive the car, and Perry saw him. Perry confronted her, and they got into a dispute over the weekly rental rate Mary had been paying. Mary called the police, and Perry had the car towed away. After their disagreement, Mary and Perry had no further problems, and Perry or "his right-hand man" continued to drive her places when needed.

Mary testified that she did not know that the defendant was going to kill the victims.

She was not sure whether the defendant knew that the reason she was going out with Perry and Manning on the night they were killed was so she could watch them have sex. Mary said that, although she never told the defendant about she and Perry's sexual encounter, she believed that he knew about it because the defendant had said that he did not want Perry coming by the house and did not want her in Perry's vehicle. Mary said that she and the defendant had dated off and on since July 1999, but she had not seen him in the two years prior to his moving in with her on Webb Street. At the time of the incident, they were "[t]rying to work it out[.]"

On cross-examination, Mary denied that she and Perry were dating even though she testified at the preliminary hearing that Perry came by her house every Sunday and she cooked dinner. Mary acknowledged that she testified at the preliminary hearing that Perry liked her and flirted with her. She stated that Perry had given her money and helped pay her utility bill once. Mary denied being angry at Perry for repossessing her rental car or making the statement, "He will get his." Mary acknowledged that when she went into the gas station in Greenwood, Mississippi, she gave the store clerk a false name and did not ask the clerk for help. Mary was confronted with various inconsistencies between her testimony on direct and her statements to the authorities or at the preliminary hearing, particularly with regard to whether she had possession of Thelmisha's cell phone when not in the defendant's presence and with regard to how long the defendant was away from their hotel room in Greenwood, Mississippi. On redirect, Mary explained that she gave the gas station clerk a false name because the defendant "didn't want anybody to know that [they] had been to Mississippi."

Christopher See testified that he knew Mary Thompson and had dated her sister, Thelmisha. On March 14, 2008, See and Thelmisha worked at the same job, and he drove her home to 10 Webb Street after they both got off work at 11:30 p.m. When they arrived at the house, he and Thelmisha walked to the front door, and Mary "cracked the door open a little bit . . . [and] whispered something to Thelmisha." See was not allowed to go inside and waited for ten to fifteen minutes until Thelmisha came back out.

See testified that Thelmisha "was looking kind of funny" when she exited the house and asked him to take her to buy some bleach. The store was nearby, and they arrived back at the house within five minutes. After Thelmisha took the bleach into the house, they started to leave for See's house. As they were leaving, he saw the defendant driving a Cadillac, and the defendant "flagg[ed] [them] down." Thelmisha got out of the car and talked to the defendant. The evening of the next day, See and Thelmisha drove to Memphis and picked up Mary and the defendant and brought them back to Jackson. Mary was "at some guy's house," and the defendant was at a gas station in a white Excursion. On cross-examination, See testified that Mary and Thelmisha "communicat[ed] throughout the day"

-8-

on Saturday by telephone.

Sterling Melton testified that the morning of March 15, 2008, he was hunting in Holmes County, Mississippi, when he found two bodies in a field near the Yazoo River. After seeing the bodies, he ran to his truck and called his father, who in turn called the sheriff's department. He remained at the scene for two or three hours after law enforcement arrived. Melton described the location where he found the bodies as very remote farmland, with the nearest house approximately three miles away.

Thelmisha Thompson testified that, on March 14, 2008, her boyfriend at the time, Christopher See, drove her home to 10 Webb Street after they got off work at 11:30 p.m. She was planning to pick up some clothes at her house and then go to See's house. When she got home, Mary opened the door, and Thelmisha saw that she was "shaking" and Ricarla, her niece, was crying on the couch. Mary "barely let [Thelmisha] past the living room," but Thelmisha saw blood and that "everything [was] messed up[.]" Mary asked her if she had seen the defendant.

Thelmisha testified that she picked up her niece and some of her clothes, which she kept in a "tote" in the living room beside the door. As she was leaving, Mary asked her to go buy some bleach. See took her to the store, and she returned to the house and handed the bleach to Mary. She did not go back inside the house. Thelmisha got back into See's car with her niece, and, as they were driving away, she saw the defendant driving Perry's tan Cadillac. The defendant "flash[ed] the lights" to get them to stop. Thelmisha got out of See's car and had a brief conversation with the defendant, during which the defendant told her that he had "messed up" and asked whether Mary had told her what had happened. She told him what Mary had told her, and the defendant did not respond. The defendant "didn't tell [her] everything, just that he had messed up. That's all he kept saying."

Thelmisha testified that she and See started driving again, but the defendant got behind them and flashed his lights. They stopped again, and she got out and talked to the defendant. The defendant was in "a panic mood" and again told her that he had "messed up." He did not give her any details, and she did not ask. Thelmisha could tell that the defendant "was panicking. His eyes [were] bugged. He looked like he was in a state of shock."

Thelmisha testified that, both times she saw the defendant, she noticed that there "was something big on the back seat [of the Cadillac] and it was like a lot of stuff on top of it." She also noticed that the defendant had blood on his shirt and face, and his shirt appeared to be ripped. After speaking with the defendant the second time, Thelmisha saw the defendant park Perry's Cadillac and walk toward the Webb Street house. She and See left

and drove to See's house, where they remained for the rest of the night.

Thelmisha testified that the next day, which was Saturday, Mary called and asked her to pick her up in Memphis at C.J.'s house. See drove her and Ricarla there. After they picked up Mary, the defendant called Thelmisha's phone and asked that they pick him up at a gas station. The defendant was in a white Excursion she had never seen before, and he left it "[b]acked in at the gas station." The defendant got into See's car, and they drove back to Jackson. See took Mary and the defendant to the Webb Street house.

Thelmisha testified that she went back to the Webb Street house around noon the next day, which was Sunday, and spoke to the defendant. The defendant told her that he and Perry had "got[ten] into a fight and that was it." He said that he took an object off the wall "and clocked [Perry] up side the head." The defendant did not say anything about a weapon other than "[w]hat was off the wall." She knew that Perry was dead, but the defendant did not tell her what he did with the body or anything about Andreca Manning. Thelmisha did not know that Manning had been at the house, and Thelmisha had not gone into the bathroom on Friday night.

Thelmisha testified that she left the Webb Street house Sunday evening and did not return until the next day after she received several messages and missed calls at work informing her that "the house had got on fire." Thelmisha left work immediately and went to 10 Webb Street to find "[a] burned house." Thelmisha recalled that, when she was interviewed by police, she told the police that the defendant had said, "I did this for your sister." She thought that the defendant meant that it was "[b]ecause of Mary and Bobby Perry's relationship."

On cross-examination, Thelmisha stated that Mary and Perry were dating and that she, Mary, and Ricarla "went over to his house sometime[s]." Thelmisha said that, at the time of the incident, the defendant had lived with her and Mary at the Webb Street house for less than a month. She said that Mary and Perry's relationship "was made clear [to the defendant] because Mr. Bobby Perry was still coming over to [the] house and it was accepted and he knew that it was a way that, you know, money was coming up in the house because [Thelmisha] was the only one working." She acknowledged that she had told the police that she never had a conversation with the defendant about how he felt about Mary and Perry's relationship. Thelmisha said that she thought Mary was trying to end her relationship with Perry.

Thelmisha testified that, if See testified that he walked with her to the front door of the Webb Street house the night of the incident, that was incorrect. She acknowledged that the defendant was not at the house when she arrived that night after getting off work.

-10-

Thelmisha admitted that she did not call the police after seeing blood inside the residence or after the defendant told her that he had "messed up."

On redirect examination, Thelmisha testified that she did not contact the police the night of the killings or over the weekend because she "really didn't know the situation of what had happened or what could have happened and [she] really just didn't want to know the details."

Dywana Broughton, a crime scene investigator with the Mississippi Bureau of Investigation ("MBI"), testified that she was called to a scene in Holmes County, Mississippi, the morning of March 16, 2008. When she arrived, she saw two bodies lying in a secluded "high, grassy area." The victims were approximately sixteen feet apart. Broughton videotaped and photographed the area and collected evidence, including a brandy bottle, a tennis shoe that matched one worn by the male victim, a "loop earring" that matched one worn by the female victim, and a black-handled knife with a broken blade. She turned the items over for processing. The female victim had "an injury to the throat area and numerous slashes on her head, face, chest and breast." The male victim "had numerous injuries. Cutting injuries to his back, stomach, head. Injuries on the knees and arms as well."

Kristopher Wingert, also a crime scene investigator with the MBI, testified that he examined a burned Cadillac that had been towed to a lot in Greenwood, Mississippi. He located partial fragments of burned clothing on the backseat of the car but noted that the car was "too heavily consumed" for him to recover any DNA or fingerprint evidence. Wingert also processed a white Ford Excursion that had been found in Memphis. He lifted fingerprints from several areas of the interior and exterior of the vehicle and collected other items to be tested, all of which he submitted to the crime lab. He also found seven areas inside the vehicle that tested positive for the presence of blood and submitted swabs of those areas to the crime lab as well.

Sergeant Tim Pyles, an investigator with the MBI, testified that the victims' bodies were discovered in a "very rural . . . field . . . off of the levy of the Yazoo [R]iver," and he requested the crime scene unit to process the scene. Sergeant Pyles observed that the male victim had an "obvious . . . puncture wound to the chest," and the female victim "had an obvious slash wound to her throat and also puncture wounds on her body." Sergeant Pyles worked with other officers in trying to identify the victims and was eventually able to trace the VIN number from a burned-out Cadillac recovered near the river to Bobby and Yolanda Perry. He contacted the Jackson, Tennessee, Police Department to find out whether it had any warrants or stolen reports on the car. The Jackson Police Department sent him driver's license photographs of Bobby Perry and Andreca Manning, which he used to identify the

bodies.

Sergeant Pyles testified that he went to an address of the defendant's relative in a trailer park and "found a shovel leaning up against a tree." He explained that "[t]he shovel appeared to be brand new and it had a stain on the handle that appeared to be blood." He submitted the shovel to the crime lab. Sergeant Pyles said that he participated in interviewing Mary Thompson on March 17, 2008, at the Holmes County Sheriff's Department.

On cross-examination, Sergeant Pyles admitted that Mary initially claimed to have no knowledge of what had happened. After the officers told Mary that they knew she was lying, Mary gave a different version of the events – a version more damaging to the defendant and herself.

Ken Spencer, Chief Investigator for the Leflore County, Mississippi, Sheriff's Department, testified that he received a call on March 16, 2008, that a burned vehicle had been discovered in a field. He went to the location and took photographs of the area. He described the "burn site" as "rural . . . [f]arm land and crop land."

Paul Wilkerson, Jr., the section chief of the Latent Print Section of the Mississippi Crime Laboratory in Jackson, Mississippi, examined a number of items of evidence recovered in the proximity of the victims' bodies and in the white Ford Excursion for comparison against known prints of the victims, the defendant, or Mary Thompson. He either found no latent fingerprints, none with enough detail for identification, or none that matched any of the four subjects.

Lynee Burleigh, a forensic scientist trainee at the Mississippi Crime Laboratory, testified that she was a medical examiner assistant in 2008. On March 19, 2008, she received two tubes of blood taken from the victims and logged them into the evidence vault. She also received other biological evidence, such as fingernail scrapings, pulled scalp hair, and known finger and palm prints, from Bobby Perry, as well as clothing from Andreca Manning.

Joseph Heflin, a forensic serologist and DNA analyst with the Mississippi Crime Laboratory, testified that he examined a shovel submitted to him for analysis and determined that the dark-colored stains at the end of the handle tested positive for blood. He also tested several swabs taken from the inside of the white Ford Excursion, and they tested positive for blood. Heflin received buccal swabs that had been taken from the defendant and Mary Thompson and preserved them for further DNA testing, along with any evidence that had tested positive for blood. The preserved items were sent to Orchid Cellmark, a private

laboratory, for DNA testing due to a high backlog of items at the crime lab.

Leslia Davis, a forensic biologist in the bioscience division of the Mississippi Crime Laboratory, testified that she received, from Lynee Burleigh, a tube of blood and a sexual assault kit taken from a victim labeled "Jane Doe." A bloodstain card created from the tube of blood was sent to Orchid Cellmark for DNA analysis. She testified that it was not unusual for a sexual assault kit to be taken during an autopsy and that she performed preliminary testing on it for blood and seminal fluid.

Peggy Rodriguez, a DNA analyst for Orchid Cellmark, testified that she received a shipment of evidence from the Mississippi Crime Laboratory and took reference samples to prepare the items for testing.

Aimee Rogers, a DNA analyst for Orchid Cellmark, analyzed the evidence received by Rodriguez and determined that a swab of blood taken from the front car door seal of the white Ford Excursion matched the defendant's DNA profile.

Dexter Howard, the Holmes County, Mississippi, coroner, testified that he went to the scene where the bodies of the victims were found bearing stab wounds and lacerations. Howard ordered that the bodies be taken to the state crime lab for autopsy.

Dr. Steven Hayne, testifying as an expert in forensic pathology, stated that he performed the autopsies on both victims. His examination of Bobby Perry showed that, in addition to multiple superficial abrasions of the skin, the victim received fifty stab wounds and nineteen slash wounds. Some of the non-fatal slash wounds were "consistent with defensive posturing injuries." There were also two lacerations to the back of the victim's head. Dr. Hayne opined that Perry died from two different types of injuries: "closed head injuries [caused by] blunt force trauma" and multiple stab wounds. Six of the stab wounds to Perry's sides, back, and abdomen were lethal wounds, and the head injury itself would have also been fatal. Dr. Hayne estimated that Perry would have died within twenty to thirty minutes from his injuries. He opined that Perry could have been dead for twenty-four to thirty-six hours "and possibly even 48 hours" before he was found.

Dr. Hayne testified that his examination of Andreca Manning showed that she had "multiple abrasions on different sites of the body." She suffered thirteen stab wounds, including three lethal ones to her chest. She also suffered nine slash wounds, "two of which were lethal on the front surface of the neck and a total of 6 slash wounds involving the digits of the left hand . . . consistent with defensive posture injuries." Dr. Hayne determined that Manning died from a combination of stab and slash wounds to the neck and chest. He opined that Manning would have become unconscious in less than a minute from her injuries

-13-

and would have died in five minutes or less. He said that the only way Manning could have survived her injuries was if they "occurred in the emergency room or trauma operating room."

Christine Robinson testified that she was working at a Shell gas station convenience store in Greenwood, Mississippi, on Saturday, March 15, 2008, with three other employees when a woman driving "a big white Excursion truck" came into the store around 11:45 a.m. The woman pumped $51 worth of gas but then came inside and said that she did not have enough money and only wanted $15 worth of gas. The woman used the store's phone to call someone at Collins Trucking Company to bring her money, and she also used one of the employee's phones to text someone to bring her money. "[S]he was there maybe 15 or 20 minutes or more." After a while, "[a] little short guy came from beside the building and he came in the store and they talked a few minutes and they left and she said she was going to bring the money back." Before the woman left, Robinson wrote down the tag number of the truck and asked the woman to write down her name, which she wrote as "Lashonda Townsend." However, Robinson recalled that when the woman sent a text message, "she texted as Mary." Robinson called the sheriff's department and reported the incident. Robinson later learned that "the little guy brought the money back."

On cross-examination, Robinson acknowledged that the woman did not ask her to call the police, do anything to make a scene, or seem afraid of the man who came in the store. On redirect, Robinson stated that, at one point, the man and woman were "whispering" in front of her and the other store employees and they could not hear the conversation.

Patricia Jordan, the defendant's aunt, testified that she lived in a mobile home park in Sidon, Mississippi, on Saturday, March 15, 2008. On that date, she arrived home and saw an unfamiliar white Ford Excursion pulling out of her driveway. When she went inside, there was an unfamiliar "female sitting on [her] couch," who identified herself as the defendant's girlfriend. The defendant came in the house, and they talked for a few minutes before Jordan went to her room to sleep. The defendant did not tell her why he and his girlfriend were there.

Jordan testified that she slept for about three hours, while the defendant and his girlfriend watched television in her living room. At some point after she got up, her husband took the defendant to the store, and she remained at the house with the defendant's girlfriend. Jordan noticed that the white Ford Excursion had a Tennessee license plate and "was kind of muddy." The defendant borrowed a pair of pants from Jordan's husband to change into, and the defendant's girlfriend had on a black sweat suit with "mud on the bottom of her pant leg" and shoes that "were real muddy." The defendant and his girlfriend

-14-

left in the Excursion sometime after dark.

On cross-examination, Jordan testified that the defendant's girlfriend had a cell phone with her that kept ringing, and that she talked on it until the battery died. She never saw the defendant's girlfriend call the police on her cell phone, and she did not ask Jordan to call the police for her. Jordan estimated that the defendant and his girlfriend were at her house for eight hours, and she did not know where they were going when they left.

Cedric Smith, Patricia Jordan's husband, testified that the defendant and his girlfriend came to his house on March 15, 2008, around noon. He had only recently met the defendant and had never met the defendant's girlfriend. Smith "ran into [the defendant]" as he was arriving home and the defendant was leaving on foot. The defendant told Smith that "they had just got off the road and they were tired and needed to rest." They had arrived in a white Excursion.

Smith testified that he invited the defendant and his girlfriend into the house, and he "drank a beer and watched TV and they took a nap." When his wife got home, "[t]hey got acquainted. They just reunited or whatever." Sometime later, Smith took the defendant to a convenience store to get some food, while his wife and the defendant's girlfriend stayed home. Before leaving for the store, the defendant told Smith that "[h]e was a little muddy and he didn't want to go to [the store] with mud on him, so [Smith] loaned him a pair of sweat pants and . . . a shirt." Around 6:00 or 7:00 that evening, after dark, the defendant and his girlfriend left Smith's house in the white Excursion. Smith did not know where they were going, and the defendant was still wearing the clothing Smith had loaned him.

Aimee Oxley, a crime scene analyst and latent fingerprint examiner for the Jackson, Tennessee, Police Department, testified that she was dispatched to 10 Webb Street in response to a house having been set on fire and a "possible homicide." When she arrived, Oxley noted that the living room, kitchen, and hallway "were heavily damaged with soot and fire," and she determined that the fire appeared to have been started in the bathroom. She observed that "there were areas especially in the living room even with the burn damage that you could tell that there were portions of carpet that had been cut up." She also discovered a mop and a bucket containing "rusty color" water in the kitchen. Oxley noted that the water in the bucket indicated "that there was a cleanup of the residence . . . after the homicide had occurred."

Oxley testified that she tested several areas around the house with a product that reacts with blood "even after [the blood has] been cleaned up with bleach or any other cleaning product." Apparent bloodstains on the back of the couch in the living room tested positive for blood, as did the couch cushions, the entryway from the front door, and most of

the kitchen floor. She took samples from the fabric, linoleum, and wood that showed the presence of blood. She did not get any reaction from the luminescing agent in the bathroom, presumably because of the extensive burn damage in the bathroom.

Oxley testified that she collected several items from around the house, including items in the kitchen trash can. She explained that "[t]here were broken pieces of wood and broken ceramics and clothing and pills and there was a cell phone in the kitchen trash." She also found an empty gallon jug of bleach, empty bottles of "Mean Green Super Strength cleaner," and an empty bottle of Lysol in the kitchen trash. Also located in the kitchen trash were a white men's undershirt "with possible blood," a used band-aid, a plastic cup "with possible blood," a pot holder, and sixty-four blue tablets and a prescription bottle "with possible blood." All of the evidence was sent to the Tennessee Bureau of Investigation ("TBI") Crime Laboratory.

Lieutenant Mike Turner with the Jackson, Tennessee, Police Department testified that he was an evidence custodian and crime scene technician, and he assisted Oxley in collecting and processing evidence at 10 Webb Street. Lieutenant Turner also took swabs for DNA testing of possible bloodstains around the front door. He collected several knives, including one "that came from the dish drainer in the kitchen area."

Agent Cathy Ferguson with the Criminal Investigation Division of the TBI testified that she assisted Aimee Oxley and Lieutenant Turner with the collection of evidence and processing the scene at 10 Webb Street on March 18, 2008. Agent Ferguson also photographed and sketched a diagram of the scene.

Agent Melanie Johnson with the TBI Drug Identification Section testified that she tested thirty-five blue tablets as well as deteriorated partial tablets and fragments recovered in this case and determined that they contained Hydrocodone, a Schedule III controlled substance.

Agent Donna Nelson, a DNA forensic analyst with the TBI, testified that she tested a blood sample taken from Bobby Perry, but the sample was too degraded for her to obtain a DNA profile. However, she was able to obtain a DNA profile from the blood sample taken from Andreca Manning. Agent Nelson tested a presumptive bloodstain on a white tank top recovered from 10 Webb Street and determined that the blood was Manning's.

Agent Nelson testified that she generated a DNA profile from the blood on a blue plastic cup from the kitchen trash and determined that it matched the DNA of an unidentified male. She later received the results of DNA testing done by Orchid Cellmark that generated a profile from other samples taken from Bobby Perry and from that determined that the

blood on the plastic cup matched Perry.

Agent Nelson testified that the blood found on the Hydrocodone tablets and prescription bottle cap belonged to the defendant. A broken piece of wood taken from the kitchen trash had blood on it from which, although the sample was degrading, she was able to partially match to Bobby Perry's DNA. Fabric taken from the back of the living room sofa contained a bloodstain Agent Nelson determined belonged to the defendant. Swabs of linoleum samples from the entryway and knives from the kitchen were negative for the presence of any blood.

Investigator Danielle Jones with the Violent Crimes Unit of the Jackson, Tennessee, Police Department testified that she photographed the white Ford Excursion at a Citgo gas station in Memphis. On March 19, 2008, Investigator Jones traveled to Mississippi to interview Mary Thompson and the defendant. She came into contact with the defendant on March 20 and took photographs of his hands. The defendant had a bandage around the index finger on one hand and, when he removed the bandage, Investigator Jones saw what "appear[ed] to be a deep cut."

**Defendant's Proof**

Officer Justin Harris with the Jackson, Tennessee, Police Department testified that he worked as a patrol officer in March 2008. On March 5, 2008, he was called to 10 Webb Street in response to a "civil dispute . . . over a vehicle." A female resident of the house called in the complaint. Officer Harris learned that the car, belonging to Bobby Perry, was being repossessed and "[n]obody had any paperwork at the time saying that car belong at 10 Webb Street so we allowed Mr. Perry's tow truck driver to take the car."

Officer Terry Buckley with the Jackson, Tennessee, Police Department testified that he was also a patrol officer in March 2008 and responded to 10 Webb Street in reference to a disturbance involving a vehicle. Bobby Perry was the owner of the car and was repossessing the vehicle. However, Officer Buckley was "told that it was a rental agreement," but the renter could not produce any paperwork for such. The complainant was one of several females on the scene that day, and the officers "just kept the peace between the two parties."

Officer Buckley testified that there was a tow truck at the scene, and the renter of the vehicle "was upset that the car was being taken away from her [and] stated that she was making payments on the vehicle and was current on the payments." When Perry arrived at the scene, the renter made a loud, angry statement directed toward Perry.

-17-

After the conclusion of the proof, the jury convicted the defendant of the first degree premeditated murder of Bobby Perry, the second degree murder of Andreca Manning, and tampering with the evidence. The defendant was acquitted on the aggravated arson charge.

## ANALYSIS

### I. Expert Witness

The defendant argues that the trial court erred in allowing Dr. Steven Hayne to testify as an expert witness in forensic pathology. In a jury-out hearing, the State questioned Dr. Hayne regarding his training and experience in forensic pathology. Dr. Hayne testified that he was a licensed medical doctor and had practiced in forensic pathology for thirty-five years. He graduated from Brown School of Medicine after completing most of his undergraduate work at North Dakota State University. He did not obtain an undergraduate degree but, after two years of medical school, was granted a baccalaureate degree in medical science. He completed his residency training in pathology at Letterman Army Medical Center in San Francisco and then was chief of pathology in military hospitals in Fort Leavenworth, Kansas, and Fort Campbell, Kentucky.

Dr. Hayne testified that, after leaving the military, he spent two years working for Shoal's Medical Laboratories and then was medical director of Rankin Medical Center in Mississippi for eighteen or nineteen years while also serving as medical director for several small hospitals in the area. He worked in the medical examiner's office in Mississippi as "acting state medical [e]xaminer, designated state pathologist and chief state pathologist." He additionally worked "for some 10 or 12 years as a forensic pathologist for some of the parishes in Louisiana." Dr. Hayne then worked for twelve years as the medical director for Rena Laboratory and presently worked as the "Medical Director of CyberNostic and the Medical Director of the Pro Laboratory." He was not, presently, an employee of the State of Mississippi and currently performed "private autopsies, medical autopsies, not medical legal autopsies." Dr. Hayne stated that he had performed approximately 35,000 autopsies in his thirty-five-year career. He had testified as an expert approximately 4500 times in various state, federal, and military courts.

On cross-examination, Dr. Hayne acknowledged that the Mississippi Public Safety Commissioner had recently removed him as the Chief State Pathologist and Designated Pathologist. He admitted that he averaged 1000 autopsies a year but that the National Association of Medical Examiners recommended that forensic pathologists only perform between 250 and 325 autopsies a year. He claimed, however, that he and his attorney surveyed pathologists around the country and "about 65 percent said they did more." He acknowledged that he was not certified by the American Board of Pathology in forensic

-18-

pathology, although he was in anatomic and clinical pathology. Because he was not certified by the American Board of Pathology in forensic pathology, he was never officially the state medical examiner for Mississippi, as Mississippi required such certification. However, he said that the attorney general's office had determined that he "was qualified." He noted that he was certified by the American Board of Forensic Pathology, but that board was not recognized by the American Board of Medical Specialties. Dr. Hayne confirmed that lawsuits had been filed against him by the Innocence Project on behalf of exonerated inmates in whose cases he had testified. He acknowledged that, in 2003, he testified in a deposition that he performed approximately 1500 autopsies a year.

After hearing Dr. Hayne's testimony concerning his qualifications, the trial court found that he was qualified as an expert in the field of forensic pathology and could give his opinions concerning the cause and manner of the victims' deaths.

Again, the defendant argues that the trial court erred in allowing Dr. Hayne to testify as an expert witness in forensic pathology. He asserts that because Dr. Hayne was not certified by the nationally recognized board for forensic pathologists, performed more autopsies annually than the maximum recommended by the certifying board, and had been sued by exonerated inmates, "[t]he cumulative effect of the challenges to Dr. Hayne's credibility as a reliable expert witness in the field of forensic pathology should serve as grounds to grant [him] a new trial." He does not challenge any of Dr. Hayne's conclusions about the cause and manner of the victims' deaths.

The admission of expert testimony is governed by Tennessee Rule of Evidence 702, which provides that "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. "The witness may acquire the necessary expertise through formal education or life experiences." State v. Reid, 91 S.W.3d 247, 302 (Tenn. 2002) (citing Neil P. Cohen et al., Tennessee Law of Evidence § 7.02[4] (4th ed. 2000)). "However, the witness must have such superior skill, experience, training, education, or knowledge within the particular area that his or her degree of expertise is beyond the scope of common knowledge and experience of the average person." Id. The determining factor is "whether the witness's qualifications authorize him or her to give an informed opinion on the subject at issue." State v. Stevens, 78 S.W.3d 817, 834 (Tenn. 2002) (emphasis omitted).

Questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court. McDaniel v. CSX Transportation, Inc., 955 S.W.2d 257, 263-64 (Tenn. 1997). As such, we will not disturb

the trial court's ruling absent a clear showing that it abused its discretion in admitting the testimony. Id.; Stevens, 78 S.W.3d at 832.

We conclude that the trial court did not abuse its discretion in allowing Dr. Hayne to testify as an expert witness in forensic pathology. Dr. Hayne's training and extensive experience in forensic pathology, including the performance of approximately 35,000 autopsies, clearly show a degree of expertise beyond the scope of common knowledge and experience of the average person. The defense thoroughly cross-examined Dr. Hayne in front of the jury, and the jury was instructed, "[I]t is up to you to decide whether you believe this testimony and choose to rely upon it. Part of that decision will depend on your judgment about whether the witness'[s] background or training and experience is sufficient for the witness to give the expert opinion that you heard." The defendant's challenges are essentially to Dr. Hayne's credibility as an expert witness, not his qualifications, which was assessed by the jury after proper instructions from the trial court. The defendant is not entitled to relief on this issue.

## II. Jury Instruction

The defendant argues that the trial court erred in not instructing the jury that Mary Thompson was an accomplice as a matter of law. After the conclusion of the proof, the defense requested that the trial court instruct the jury that Mary was an accomplice as a matter of law as to the murder and tampering with the evidence charges. Defense counsel asserted that Mary's testimony, and the fact she was indicted along with the defendant, showed she was an accomplice as a matter of law. The court reviewed Mary's testimony and determined that "it is a question of fact for the jury to determine . . . whether . . . she was in fact an accomplice in these charges or these acts." Thereafter, the trial court instructed the jury accordingly, including the instruction that if it found Mary to be an accomplice, there would have to be corroborating evidence to support her testimony.

An accomplice is defined as one who "knowingly, voluntarily, and with common intent participates with the principal offender in the commission of the crime alleged in the charging instrument." State v. Griffis, 964 S.W.2d 577, 588 (Tenn. Crim. App. 1997). The test for determining whether a witness is an accomplice is whether the witness could be indicted for the same offense as the defendant. See State v. Green, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995); State v. Lawson, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). When the evidence is clear and undisputed that a witness participated in the crime, then the trial court must declare the witness to be an accomplice as a matter of law and instruct the jury that the witness's testimony must be corroborated. Lawson, 794 S.W.2d at 369. On the other hand, when the evidence is unclear, it becomes a question of fact for the jury to determine whether the witness is an accomplice and, if so, whether there is corroborating

evidence to support the witness's testimony. Id.; see Green, 915 S.W.2d at 831-32.

As mentioned above, Mary Thompson was indicted for the same charges as the defendant; however, the court found that there was a factual question as to her degree of participation in the crimes. The defendant specifically points to Mary's testimony "that she threw a knife towards [the defendant] while he was struggling with Mr. Perry" to assert that there was no dispute to Mary's "participation in the[] events." However, Mary's actual testimony at trial was that she walked inside the house and saw Perry lying on the floor with the defendant on top of him, holding his knee to Perry's neck. She stated that Perry said to her, "'Help me baby,'" and the defendant said, "'No. No[]'" and "tried to get [her] to give [the knife] to him." She "kicked" the knife "close to [Perry's] foot" and ran out the door. In ruling on the issue at the motion for new trial, the trial court stated, "[A]ccording to [Mary's] testimony, she simply kicked the knife over in the direction of where these two individuals were struggling and then she ran out of the residence. . . . I certainly felt like it was at least a jury question and I did instruct the jury as to the law of accomplice."

We conclude that there was arguably a factual question as to Mary's participation. There was no proof of any participation on her part in the murder of Manning, the proof concerning her involvement in the murder of Perry could be subject to different interpretations, and questions were raised as to the voluntariness of her participation in tampering with the evidence. In any event, any error in the trial court's not instructing the jury that Mary was an accomplice as a matter of law was harmless because there was evidence to corroborate Mary's testimony.

The principle of corroboration has been explained by our supreme court as follows:

"[T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration."

-21-

State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994) (quoting State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992)). Whether sufficient corroboration exists is for the jury to determine. State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001).

As evidence of corroboration, Thelmisha testified that, when she arrived home the night of the offenses, there was blood inside the living room and she was asked to go buy bleach. After dropping off the bleach, she saw the defendant driving Perry's tan Cadillac and noticed that there "was something big on the back seat [of the Cadillac] and it was like a lot of stuff on top of it." Thelmisha had a brief conversation with the defendant in which she told the defendant what Mary had told her about what had just happened, and the defendant told Thelmisha that he had "messed up." The defendant later told her that he and Perry had "got[ten] into a fight" and that he had taken an object off the wall "and clocked [Perry] up side the head." Christopher See, Thelmisha's boyfriend at the time of the offenses, testified that he took Thelmisha to buy bleach. After dropping off the bleach at the house, he saw the defendant driving a Cadillac. See and Thelmisha both testified that they drove to Memphis the next day to pick up Mary and the defendant. The defendant was at a gas station in a white Excursion. Forensic testing confirmed the presence of both victims' and the defendant's blood at the scene. Forensic testing also revealed that blood had been cleaned up in the living room and kitchen of the residence. This evidence fairly and legitimately connects the defendant with the commission of the crimes; thus, any error in the court's instructions was harmless.

### III. Sufficiency of the Evidence

The defendant challenges the sufficiency of the convicting evidence. He argues, with respect to all of his convictions, that Mary Thompson lacked credibility. With respect to the first degree murder conviction, the defendant argues that the State presented no evidence of premeditation. With respect to the second degree murder conviction, the defendant argues that no witness saw him attack Manning and that he did not know her or have reason to kill her.

When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree murder is "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2006). "Premeditation" is defined in our criminal code as

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).

Whether premeditation exists in any particular case is a question of fact for the jury to determine based upon a consideration of all the evidence, including the circumstantial evidence surrounding the crime. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Pike, 978 S.W.2d 904, 914

(Tenn. 1998). Facts from which the jury may infer premeditation include the defendant's declaration of an intent to kill the victim; the use of a deadly weapon upon an unarmed victim; the establishment of a motive for the killing; the particular cruelty of the killing; the infliction of multiple wounds; the defendant's procurement of a weapon, preparations to conceal the crime, and destruction or secretion of evidence of the killing; and the defendant's calmness immediately after the killing. State v. Jackson, 173 S.W.3d 401, 409 (Tenn. 2005); State v. Thacker, 164 S.W.3d 208, 222 (Tenn. 2005); State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004); State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997).

Second degree murder is defined as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (2006). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Id. § 39-11-302(b). "Second degree murder is a result of conduct offense and accordingly, the nature of the conduct that causes death or the manner in which one is killed is inconsequential under the second degree murder statute." State v. Brown, 311 S.W.3d 422, 431-32 (Tenn. 2010) (internal quotations omitted). Whether the defendant "knowingly" killed the victim is a question of fact for the jury. See State v. Inlow, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000). The jury may infer intent from the character of the offense and from all the facts and circumstances surrounding the offense. See id. at 105 (citing State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)). If a defendant acts intentionally, meaning he acted with a conscious objective or desire to cause the death of the victim, then the requirement of "knowingly" is met. Tenn. Code Ann. § 39-11-301(a)(2).

Tampering with the evidence is proscribed as follows:

(a) It is unlawful for any person, knowing that an investigation or official proceeding is pending or in progress, to:

(1) Alter, destroy, or conceal any record, document or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding[.]

Id. § 39-16-503(a)(1).

In the light most favorable to the State, the proof shows that the defendant was aware that his girlfriend, Mary Thompson, was in a relationship of some type with Bobby Perry. On the night of the incident, Perry arrived at Mary's house to take her to watch him and Manning have sex. Perry was attacked by the defendant soon after he walked inside the

-24-

house to check on Manning, who had gone into the house to use the bathroom but had not emerged. Mary was waiting outside in Perry's car but, when she heard loud thumping sounds, went inside to discover the defendant struggling on top of Perry. When Perry asked for help and the defendant asked for a nearby knife, Mary kicked the knife toward Perry's leg and ran. Mary later discovered Manning's dead body lying in her blood-covered bathroom.

After the killings, the defendant concealed the dead bodies in Perry's Cadillac and directed the cleaning of the blood from the house. He then had Mary lead the way to Mississippi in another of Perry's vehicles, a Ford Excursion, while he followed in Perry's Cadillac. Once in Mississippi, the defendant had Mary purchase a shovel and then left her at an abandoned building. When he returned, the backseat of the Cadillac, that previously had "something big on the back seat [with] a lot of stuff on top of it," was empty. The defendant set the Cadillac on fire after an unsuccessful attempt to dispose of it by driving it into a lake. The defendant and Mary went to the home of one of the defendant's relatives and waited until dark before eventually being picked up by Mary's sister in Memphis and abandoning Perry's Excursion at a gas station.

Shortly after the killings, the defendant asked Thelmisha if Mary had told her what had happened, but he did not respond when Thelmisha relayed what Mary had told her. The defendant only told Thelmisha that he had "messed up." The defendant later told Thelmisha that he had hit Perry on the head with an object taken from the wall. The defendant told Mary that he had killed Perry "for us" and because "he had to." Mary believed that Manning was killed "because she was there."

The autopsy of Bobby Perry showed that Perry suffered a closed head injury, caused by blunt force trauma, that would have been fatal. He also received fifty stab wounds and nineteen slash wounds, some of which were "consistent with defensive posturing injuries." Six of the stab wounds to Perry's sides, back, and abdomen were lethal wounds. The autopsy of Andreca Manning showed that she suffered thirteen stab wounds, including three lethal ones to her chest. She also suffered nine slash wounds, "two of which were lethal on the front surface of the neck and a total of 6 slash wounds involving the digits of the left hand . . . consistent with defensive posture injuries." She died from a combination of stab and slash wounds to the neck and chest. Manning would have become unconscious in less than a minute from her injuries and would have died in five minutes or less.

The above evidence was abundantly sufficient to establish that the defendant's killing of Perry was premeditated and intentional. The evidence indicates that the defendant hit Perry on the head with a heavy object when he entered the house and then stabbed and slashed him repeatedly with a knife. The defendant told Mary that he killed Perry "for us."

-25-

The jury could infer that the killing was premeditated based on the number of wounds inflicted on Perry, the defendant's preparations to conceal the crime, and the defendant's destruction and secretion of evidence. In addition, even though there was testimony that Perry was briefly able to obtain a knife and cut the defendant's finger, that happened after Perry was already on the floor bleeding heavily. Thus, the defendant attacked an effectively unarmed victim.

With respect to the killing of Manning, the defendant argues that no witness saw him attack her and that he did not know her or have reason to kill her. However, the evidence showed that the defendant was the only other person in the house with Manning after Mary left Manning in the bathroom and indicates that the defendant killed her to remove a witness to his premeditated killing of Perry. Given the multiple stab and slash wounds to Manning's neck and chest, the jury certainly could have concluded that the defendant knowingly killed her.

There was also considerable evidence that the defendant tampered with the evidence. He cleaned the blood from the scene, removed and disposed of the dead bodies in an out-of-state location, and set one of Perry's cars on fire and abandoned the other at a gas station, after an unsuccessful attempt to sell both cars to an acquaintance. The crux of the defendant's complaint regarding the tampering with the evidence conviction, and side argument regarding the other convictions, is that the State's witness, Mary Thompson, lacked credibility. However, credibility of the witnesses is a jury determination, and there was evidence to corroborate Mary's account of the defendant's actions. We conclude that the evidence was sufficient to support the jury's findings that the defendant committed the first degree premeditated murder of Perry, second degree murder of Manning, and tampered with the evidence.

## IV. Sentencing

The trial court conducted a sentencing hearing, at which the State introduced a copy of the presentence report with the attached victim impact statements. Loleta Middleton, the defendant's first cousin, testified on the defendant's behalf. Middleton said that she was present for the entire trial. She expressed the love she and her family had for the defendant and also expressed sympathy for the families of the victims. After hearing the arguments from counsel, the trial court sentenced the defendant to a mandatory life sentence on his first degree murder conviction, twenty-five years on his second degree murder conviction, and six years on his tampering with the evidence conviction. The court ordered that the twenty-five-year sentence run consecutively to the life sentence and the six-year sentence run concurrently.

On appeal, the defendant challenges the trial court's imposition of a partial consecutive sentence, arguing that, because he received an automatic life sentence for the first degree murder conviction, "[t]he trial court's adding of twenty-five years to an already lengthy sentence will not effectively serve the ends of justice." When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record "with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2006). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000).

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statistical information provided by the administrative office of the courts as to Tennessee sentencing practices for similar offenses, (h) any statements made by the accused in his own behalf, and (i) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210 (2006); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2006), Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

Tennessee Code Annotated section 40-35-115(b) provides that it is within the trial court's discretion to impose consecutive sentencing if it finds by a preponderance of the evidence that any one of a number of criteria applies, including that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(2), (4) (2006). When a trial court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it is required to make further findings that the aggregate length of the defendant's sentence reasonably relates to the severity of his offenses and is necessary to protect the public from further criminal conduct of the defendant. State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999); State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995). The trial court must "specify the reasons" behind its imposition of a consecutive sentence. See Tenn. R. Crim. P. 32(c)(1). The criteria listed

in section 40-35-115(b) are stated in the alternative; therefore, only one need exist to support the appropriateness of consecutive sentencing.

In making its decision, the trial court found that the defendant was a dangerous offender whose behavior indicated little or no regard for human life and who had no hesitation committing a crime when the risk to human life was high. The court also found that the circumstances surrounding the commission of the offenses were "particularly aggravated" and that "confinement for an extended period of time [wa]s necessary to protect society from [the] defendant's unwillingness to lead a productive life and also the defendant's resort to criminal activity in furtherance of antisocial life-style." The court noted that "in this case the commission[] of these two murders was particularly brutal. Horrendous murders." The court then summarized the medical examiner's testimony regarding the severity of the injuries suffered by both victims.

The court found that an extended period of incarceration was necessary to protect society. The court noted that the presentence report reflected that the defendant was charged with two counts of first degree murder in Mississippi in 2001 at the age of seventeen and that he had pled guilty to the lesser offense of accessory after the fact to capital murder, receiving two consecutive five-year sentences. Thus, "[i]n less than a seven year period of time, [the defendant was] involved to some extent in four murders of four different individuals. Now, that's not even considering the fact that the majority of that seven year period of time . . . he was incarcerated . . . serving a ten year sentence."

The court lastly found that "the aggregate length of the sentences . . . reasonably relates to the offenses for which the defendant stands convicted," observing that "there was really no motive to kill Ms. Andreca Manning. . . . [S]he just happened to be at the wrong place at the wrong time . . . . [She was] the one person that could perhaps identify him as the perpetrator." The court noted that concurrent sentences would "mean[] that [the defendant] would go unpunished for the death of Ms. Manning."

As carefully set out above, the trial court thoroughly considered the evidence and the required sentencing considerations. The record abundantly supports that the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high, and that the aggregate length of the defendant's sentence reasonably relates to the severity of his offenses and is necessary to protect the public from further criminal conduct of the defendant.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the

trial court.

_____
ALAN E. GLENN, JUDGE